D-25 September Term 2013

IN THE MATTER OF                    :

WANDA MOLINA,                       :

AN ATTORNEY AT LAW                  :        ORDER       JAN 31 2014

(Attorney No. 013591989)            :                          CLERK

                                    :

The Disciplinary Review Board having filed with the Court its decision in DRB 13-097, concluding that **WANDA MOLINA** of **JERSEY CITY**, who was admitted to the bar of this State in 1989, should be suspended from the practice of law for a period of six months for violating RPC 8.4(b) (commission of a criminal act that reflects adversely on the attorney's honesty, trustworthiness or fitness as a lawyer) and RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation); and good cause appearing;

It is ORDERED that **WANDA MOLINA** is suspended from the practice of law for a period of six months and until the further Order of the Court, effective February 28, 2014, and it is further

ORDERED that respondent comply with Rule 1:20-20 dealing with suspended attorneys; and it is further

ORDERED that pursuant to Rule 1:20-20(c), respondent's failure to comply with the Affidavit of Compliance requirement of Rule 1:20-20(b)(15) may (1) preclude the Disciplinary Review

Board from considering respondent's petition for reinstatement for a period of up to six months from the date respondent files proof of compliance; (2) be found to constitute a violation of RPC 8.1(b) and RPC 8.4(c); and (3) provide a basis for an action for contempt pursuant to Rule 1:10-2; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs and actual expenses incurred in the prosecution of this matter, as provided in Rule 1:20-17.

WITNESS, the Honorable Jaynee LaVecchia, Presiding Justice, at Trenton, this 30th day of January, 2014.

CLERK OF THE SUPREME COURT

The foregoing is a
of the original on file my office.

CLERK OF THE SUPREME COURT
OF NEW JERSEY

SUPREME COURT OF NEW JERSEY
Disciplinary Review Board
Docket No. DRB 13-097
District Docket No. XIV-2007-0567E

IN THE MATTER OF          :
                          :
WANDA MOLINA             :
                          :
AN ATTORNEY AT LAW        :
                          :

Decision

Argued:  September 19, 2013

Decided: November 7, 2013

Jason D. Saunders appeared on behalf of the Office of Attorney Ethics.

Marc D. Garfinkle appeared on behalf of respondent.


To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey.

This matter was before us on a motion for final discipline filed by the Office of Attorney Ethics (OAE). The OAE recommended discipline in the range of a two-to-three-year suspension for respondent's guilty plea to the third-degree crime of tampering with public records or information, and the fourth-degree crime of falsifying records. For the reasons

expressed below, we determine that a six-month suspension is warranted.

Respondent was admitted to the New Jersey bar in 1989. She maintains a law office in Fort Lee, New Jersey. She has no history of discipline.

On June 4, 2010, respondent entered a guilty plea to counts four and five of a five-count State Grand Jury Superseding Indictment. The remaining counts were dismissed. Count four, third-degree tampering with public records or information, alleged that respondent did "knowingly on one or more occasions, make entries onto one or more parking summons[es], consisting of the word 'emergency,' and that said false entries were made with the purpose to defraud or injure the City of Jersey City, contrary to the provisions of N.J.S.A. 2C:28-7a(1)." Count five, fourth-degree falsifying records, alleged that respondent "with the purpose to deceive or injure another or to conceal any wrongdoing, did knowingly falsify a writing or record, knowing the same to be false, by making entries onto one or more parking summons[es], consisting of the word 'emergency,' and the said false entries were made contrary to the provisions of N.J.S.A. 2C:21-4a."

The factual basis for the plea was elicited during respondent's plea hearing:

2

Over the course of approximately six months, between October 30, 2006 and April 2, 2007, while respondent was Chief Judge of the Jersey City Municipal Court, she abused her authority by adjudicating nine parking tickets that had been issued to her "significant other." Respondent either dismissed those tickets outright or wrote "Emergency" on them and then dismissed them, even though she was aware that no emergency had existed. Respondent dismissed the tickets so that her significant other would avoid having to pay the resulting fines to Jersey City; a benefit to both respondent and her significant other. The tickets were valued at over $200. Respondent conceded that, as Chief Judge, she should either have requested a change of venue because of the conflict, or should have paid the tickets.

In exchange for respondent's guilty plea to counts four and five, the deputy attorney general recommended a term of probation. He further recommended that she resign her position as a municipal court judge, forego any future public employment, pay restitution, and waive her right to apply for admission to the pre-trial intervention program.

At the sentencing hearing, respondent's attorney pointed out that eighteen character letters had been submitted on her behalf (also a part of this record); she deeply regretted and

3

was embarrassed about the incidences; she served her community for a substantial period; she is an Hispanic who has helped women and minorities for the majority of her life; she intended to compensate Jersey City for the tickets that she had improperly dismissed; she had no criminal history; the conduct was unlikely to recur, she resigned her position as chief judge; she was greatly remorseful for her conduct; and she cooperated with law enforcement.

At the sentencing hearing, respondent stated that she had suffered a lapse in judgment, but had not recognized that her acts were criminal in nature; she accepted responsibility for her conduct; and the punishment that she had "already endured for the past three years . . . would be with [her] for the rest of [her] life." She apologized publicly for her conduct.

To calculate the sentence, the judge balanced the mitigating and aggravating circumstances. The judge stated that, although ordinarily, he would take into account that respondent's conduct "breached the public trust" and that her offense involved fraudulent or deceptive practices committed against a division of state government, for purposes of sentencing, he considered only the need to deter respondent and others from engaging in similar conduct.

4

In addition, the judge noted that judges should be held to the highest standards in order to maintain the integrity of the judicial system, as well as to maintain the public's faith in the system. He ordered respondent to serve three years' probation, "364 [days] in the Bergen County Jail as a reverse split;" to serve 500 hours of community service; to forfeit the right to hold public employment; and to pay restitution and penalties.

The eighteen character letters submitted in connection with the sentencing attested to respondent's loyalty to family and friends, honesty, record of public service, compassion, drive, perseverance, and involvement in the community. Two of the more notable letters were written by Frances Lawrence Antonin, a retired judge of the Jersey City Municipal Court, and Janice Gutloff, respondent's long-time friend.

Antonin wrote, among other things, that respondent is a hard-working, decent, honest and trustworthy person; was truly humbled by the experience; was remorseful; and accepted full responsibility for her actions. She had called him personally and apologized to him and to others "for failing her family, the citizens she served and [him] as someone she considered a mentor." Antonin noted that it is always tragic when a good

5

person, like respondent, who served with honor, "suffers a life altering lapse in judgment such as this."

According to Gutloff's letter, she met respondent twenty-eight years earlier while they served on the same jury. Respondent's goals at that time were to become a lawyer and to help her community. Gutloff stressed that respondent achieved these goals while working two jobs, helping to support her family, and suffering personal losses.

Gutloff pointed out that, having grown up in East Harlem, respondent was well aware of the need to provide legal services to the disadvantaged. According to Gutloff, over the years, respondent was an advocate for the less fortunate, provided <u>pro bono</u> services, taught karate to children, mentored inner city students, established a legal internship program, and spoke at school career fairs. Gutloff added that, while serving on the bench, respondent's "fight for quality of life issues led [her] to implement a specialized court for domestic abuse, DWI, and juvenile justice."

Gutloff remarked that the investigation had taken an emotional and financial toll on respondent. She lost her home, her pension, and her savings and returned to live with her ailing mother.

> Against all odds, a young Latina girl from a
> poverty stricken family in East Harlem with

6

> dreams of becoming an attorney works hard, earns a scholarship to a private high school, receives a scholarship to college, puts herself through law school, sets up practice, earns respect and recognition, is appointed chief justice, then loses it all. "The fall from grace" seemed like punishment enough. . . .
>
> When I view her life as a whole, it's not this event that stands out in my mind. It's the unselfish friend who stands by her family and friends, fights for the underdog and stays true to herself. All of the good Wanda has done (and will continue to do) should not be overshadowed by this event.
>
> [Ex.G.Gutloff.]

In recommending a two-to-three-year suspension, the OAE relied on the following companion ticket fixing cases: (1) In re Delucia and In re Terkowitz, 76 N.J. 329 (1978) (two municipal court judges each suspended for one year and removed from the bench for their roles in dismissing a traffic ticket); (2) In re Hardt, 72 N.J. 160 (1977) (removal from the position of municipal court judge and reprimand for permitting himself to be used as part of a ticket fixing attempt) and In re Weishoff, 75 N.J. 326 (1978) (one-year suspension for the municipal prosecutor who had a deputy court clerk stand in for a defendant to plead not guilty to a ticket that was dismissed due to the purported unavailability of the arresting officer); and (3) In re Spitalnick, 63 N.J. 429 (1973) (two-year suspension for municipal court judge) and In re Sgro, 63 N.J. 539 (1973) (six-

7

month suspension for another municipal court judge) (ticket-fixing of a DWI ticket).

The OAE also cited the more serious case of In re Boylan, 162 N.J. 289 (2000), where a Jersey City municipal court judge was disbarred for a scheme to defraud the city of money by reducing traffic violation fines and penalties of female defendants in exchange for sexual favors. He coached the defendants to lie in open court about the circumstances of their tickets and penalties. Boylan acknowledged that the city lost over $10,000 as a result of the scheme. He entered a guilty plea to the use of the mails to perpetrate the fraud, was sentenced to thirty months in prison, three years' probation, and was ordered to make restitution to Jersey City.

Here, the OAE highlighted, among other things, the fact that respondent's misconduct was not an isolated incident but a pattern of practice, she dismissed a number of parking tickets over the course of a year. The OAE argued that respondent's case was more serious than the cases where only one ticket was involved.

The OAE drew a parallel between the Boylan case and respondent's, noting that both judges were subject to criminal convictions relating to their judicial functions and both received a personal benefit from their misconduct. The OAE

8

conceded, however, that Boylan's conduct was "factually more troubling" than respondent's.

In a brief submitted to us, respondent's counsel argued that respondent's case was arbitrarily singled out from similar cases and was met with harsher penalties than other judges similarly situated. In the brief, counsel cited a New Jersey Administrative Office of the Courts Report on the Review of the Ticket Dismissal Procedures in the Municipal Court System dated July 31, 2008. According to counsel, in October 2007, although the Division of Criminal Justice charged three of four Jersey City judges with official misconduct for dismissing tickets for themselves, family, or friends, only respondent was prosecuted.

Counsel maintained that respondent's acts were less egregious than those of others guilty of similar misdeeds. According to counsel, respondent dismissed parking tickets of her closest friend, without that friend's knowledge or consent. Respondent acted alone. She neither enlisted anyone's assistance nor informed anyone when the tickets were dismissed. When she was caught, she was cooperative and forthright.

Counsel argued that any suspension should be shorter than those imposed in the matters where judges acted in concert with others. He asserted that respondent's conduct was not as

9

sophisticated or offensive as that of other judges and that she has already been punished criminally.

Respondent has been

> practicing ethically, productively, and in a socially-positive way. She is active in her ethnic community, the gay community, the feminist community, her neighborhood and her profession. She can far better serve the interest of the public and the bar from her post as attorney, than she would if she is suspended for any period of time.

[RB10.][1]

Moreover, counsel highlighted respondent's accomplishments, which included the establishment of a domestic violence advocate referral system in her court; the reduction of court expenditures for interpreter services from $100,000 to $30,000 annually; the launch of the Summer Youth Law Program; and improved efficiency and economy throughout the system.

Counsel emphasized respondent's acknowledgement of wrongdoing, her continued regret for her conduct, and the public shame she endured. He urged us to explore disciplinary measures other than a suspension so that respondent can continue to serve the needs of the bar and the public.

Following a review of the full record, we determine to grant the OAE's motion for final discipline.

---

[1] RB refers to respondent's counsel's brief to us.

10

The existence of a criminal conviction is conclusive evidence of respondent's guilt. R. 1:20-13(c); In re Gipson, 103 N.J. 75, 77 (1986). Respondent's guilty plea to having violated N.J.S.A. 2C:28-7(a)(1) and N.J.S.A. 2C:21-4(a) constitutes a violation of RPC 8.4(b) (commission of a criminal act that reflects adversely on the attorney's honesty, trustworthiness or fitness as a lawyer) and RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation). Only the quantum of discipline to be imposed remains at issue. R. 1:20-13(c)(2); In re Lunetta, 118 N.J. 443, 445 (1989).

The sanction imposed in disciplinary matters involving the commission of a crime depends on numerous factors, including the "nature and severity of the crime, whether the crime is related to the practice of law, and any mitigating factors such respondent's reputation, . . . prior trustworthy conduct, and general good conduct." In re Lunetta, supra, 118 N.J. at 445-46.

The discipline imposed in cases involving similar violations has ranged from a reprimand to disbarment.

As noted earlier, in In re De Lucia and In re Terkowitz, supra, 76 N.J. 329, each attorney received a one-year suspension. At the time of their misconduct, they were both municipal court judges in Rutherford, New Jersey. Barbara Spencer, Terkowitz's secretary, received a ticket for passing a

school bus on her way to work. Later that day, she informed Terkowitz that she had not seen the school bus because of other traffic. Terkowitz telephoned De Lucia and explained that Spencer had been experiencing physical problems due to her pregnancy, that her view had been obstructed and, therefore, she had not seen the school bus before passing it. De Lucia then contacted the ticketing officer, explained the circumstances, and asked whether he would object if they "took care of it." He did not.

While in chambers, without anyone appearing before him, De Lucia "personally noted a not guilty plea on the court copy of [Spencer's] summons and entered a judgment of not guilty." In the portion of the summons for the witness' testimony, in the absence of a court hearing or any testimony, De Lucia wrote "testimony that . . . defendant states view was obstructed by trees . . . ." Spencer's acquittal was based solely on the information that De Lucia had received from Terkowitz.

When the prosecutor's office investigated the Spencer summons, De Lucia arranged for Spencer to prepare an affidavit reciting what had occurred, and to back-date it to the date of the summons, which was also the date that she had conveyed the information to Terkowitz.

12

De Lucia testified before the Advisory Committee on Judicial Conduct that, as to Spencer's affidavit, he had known that he was "arranging for the filing of a false document."

The Court noted that it had previously denounced ticket-fixing, "with its ramifications of false records, false reports, favoritism, violation of court rules, and cover-up, all of which exist in this case. . . . Such conduct compromises the integrity of the judicial process and violates the fundamental principles of impartial justice."

Although De Lucia resigned his position as municipal court judge, suffered great mental anguish, and did not personally profit from the misconduct, the Court imposed a one-year suspension. The Court stated:

> A judge who does "favors" with his office is morally an embezzler. He is also a fool, for a judge who plays a "good" fellow for even a few must inevitably be strained with the reputation of a man who can be reached. [citations omitted.]

[_Id._ at 336.]

As to Terkowitz, the Court found that he knowingly participated in the improper dismissal of the traffic summons and attempted to conceal the wrongdoing by permitting the preparation of an affidavit with a backdated acknowledgement and by executing a false jurat.

13

In *In re Hardt*, *supra*, 72 *N.J.* 160 (municipal court judge) and *In re Weishoff*, *supra*, 75 *N.J.* 326 (municipal prosecutor), the municipal court judge was removed from his position and reprimanded, while the prosecutor was suspended for one year for participating in fixing a speeding ticket.

In *Hardt*, after Muriel Mansmann received a speeding ticket, the return date of the summons was adjourned at the request of her attorney and re-calendared. When the officer who issued the ticket discovered that his and Mansmann's names had been crossed off the calendar, he assumed that the case had been postponed or that Mansmann had entered a guilty plea.

Later that day, when only Hardt, the court clerk, the deputy clerk and Municipal Prosecutor Weishoff were still in the courtroom, Weishoff called Mansmann's name and simultaneously beckoned the deputy clerk to come forward. When Hardt asked the deputy clerk how she pleaded, Weishoff whispered to her to respond "not guilty," which she did. Hardt then announced that he would deny a continuance and direct a verdict of not guilty. He completed the back of the summons "by writing in under finding 'N.G.'"

The Court found that Hardt had not known in advance that any fraud or ticket-fixing was about to occur. Although, at the hearing before the Court Hardt had insisted that the entire

14

"affair was a 'farce'" and that they were "simply clowning around," the Court found that Hardt permitted himself to be used and to become a part of a ticket-fixing attempt. The Court was not swayed by Hardt's efforts to minimize the seriousness of his misconduct based on his lack of advance knowledge of the plot, because of "his incorrect completion of the summons, his signature and stamp of approval thereon, his failure thereafter to do anything to correct or rectify it, his knowledge that [the deputy clerk] stood before him --- not Muriel Mansmann, and his awareness that the Prosecutor's statements were inaccurate." In addition, the Court considered that Hardt knew that the defendant's failure to appear did not justify a finding of not guilty.

In imposing only a reprimand, the Court considered that the transgression had constituted a single aberrational act and was not part of a course of conduct, Hardt had an otherwise unblemished record, and, as a member of the bar, maintained a general reputation for integrity and high character.

As to Weishoff, the Court determined that he was a knowing participant to the improper disposition of the traffic ticket, and found that his explanation, that they were "just fooling around," was not credible. Although the Court held that Weishoff's behavior involved misrepresentation and conduct

15

prejudicial to the administration of justice, the Court was satisfied that Weishoff sought no personal profit and thought he was doing someone a "favor."

The Court rejected Weishoff's argument that, because he had resigned as municipal prosecutor, he should be reprimanded like Hardt. The Court distinguished the two cases, finding that Hardt had "suffered the ignominy of being removed from his judgeship for misconduct in office" and that, by virtue of such removal, could not thereafter hold judicial office.

The Court found that the principles enunciated in In re Mattera, 34 N.J. 259, 275-276 (1961) that "[j]ustice is the right of all men and the private property of none. The judge holds this common right in trust, to administer it with an even hand in accordance with the law. A judge who does 'favors' with his office is morally an embezzler," applied with equal force to municipal prosecutors. In imposing a one-year suspension, the Court determined that Weishoff's conduct could not be condoned, that the improper disposition of a traffic ticket undermines the judicial process, and that "[p]articipation in such disposition by the municipal prosecutor makes it that much more grievous."

In In re Spitalnick, supra, 63 N.J. 429, and In re Sgro, supra, 63 N.J. 539, municipal judges received two-year and six-

16

month suspensions, respectively, for their involvement in fixing a ticket for DWI.

Spitalnick approached Sgro about dismissing a DWI ticket for his former client. Spitalnick marked the ticket "not guilty" and noted on it that the defendant was under medical treatment at the time of the DWI. He did nothing to verify the defendant's excuse to him about his medical condition. Sgro dismissed the ticket. In imposing discipline, the Court considered mitigating circumstances, including Spitalnick's prior clean record, voluntary admission of guilt, ultimate cooperation with law enforcement, lack of personal gain, and the fact that it was a single incident in a "wrongheaded and highly improper attempt to 'aid' a despondent client." In imposing a two-year suspension, the Court wrote:

> Respondent's activities, however, hold a deeper significance in that they expose the probity of the Bench and Bar to question. This Court cannot allow the integrity of the judicial process to be compromised in any way by a member of either Bench or Bar. This is especially so where, as here, the particulars demonstrate that the proper channels of justice have been diverted. We must guard not only against the spectacle of justice corrupted in one instance, but against the subversion of confidence in the system itself. A community without certainty in the true administration of justice is a community without justice.
>
> Nowhere can the community be more sensitive to the regularities -- and irregularities --

of judicial administration than at the local level. While on the grand scale of events a traffic violation may be of small significance, the corruption of judicial administration of a Municipal Court is of paramount importance. Such conduct, visible and apparent to the community, destroys the trust and confidence in our institutions upon which our entire governmental structure is predicated. We cannot and will not tolerate members of the profession subverting judicial integrity at any level, for the damage is irreparable.

[In re Spitalnick, supra, 63 N.J. at 432.]

As to Sgro (six-month suspension), the Court considered that he had resigned his position as a municipal court judge; that, although he knew it was improper to dismiss the ticket without the appropriate medical information, he did so relying on Spitalnick, who had considerable experience and had prevailed upon him to act improperly; that he received no financial gain; and that he had a good reputation in the community.

Finally, in In re Boylan, supra, 162 N.J. 289 (disbarment for municipal court judge who solicited sexual favors in a scheme to reduce traffic fines and penalties for female defendants), the Court found that "the impugnment of the integrity of the legal system" was "[s]o deep and so profound," that disbarment was the only appropriate penalty.

In the present case, we do not find it significant that respondent was unaware that her conduct constituted a criminal

18

act or that she may have been singled out for prosecution. Her conduct was unethical. Moreover, she held a public office at the time of her wrongdoing. As the Court found in In re Maqid, 139 N.J. 449, 455 (1995):

> Attorneys who hold public office are invested with a public trust and are thereby more visible to the public. Such attorneys are held to the highest of standards. Respondent's conduct must be viewed from the perspective of an informed and concerned private citizen and be judged in the context of whether the image of the bar would be diminished if such conduct were not publicly disapproved. In re McLaughlin, 105 N.J. 457,461 (1987) (citation omitted).

Here, respondent's conduct was more serious than in the cases where only one instance of ticket-fixing occurred, particularly because, in those cases, there was no personal benefit to the judges or prosecutor. Respondent disposed of at least nine tickets on behalf of her significant other. There was, thus, a pattern of misconduct and a financial benefit of more than $200 to respondent and her significant other, as well as a concurrent loss to Jersey City.

In contrast, the amount of loss here is not in the same category as the $10,000 loss in the Boylan matter. Moreover, Boylan's conduct was particularly repugnant, in that he preyed on poor, single, minorities because of their vulnerability. His motivation was his own sexual gratification. Clearly, that is

19

not a factor here. There is no comparison between the severity of the Boylan matter and this matter.

While respondent's conduct was improper and repetitive, she advanced compelling mitigating factors that include her sincere contrition, previous unblemished record, otherwise good character and reputation in the community, and extensive civic efforts in the community. In addition, she forfeited her position and the right to hold future public employment. Also, as pointed out by her counsel, her conduct did not enlist wrongdoing by another.

On one hand, and because of the compelling mitigation, we find that a two-year suspension is too severe (Spitalnick — requested another municipal judge to dismiss his former client's ticket without providing corroborating medical proof of his client's medical condition). On the other hand, in our view, the reprimand imposed in Hardt would be insufficient in this case. Moreover, Hardt appears to be an anomalous decision because other municipal judges who forfeited their positions for ticket-fixing received suspensions (De Lucia received a one-year suspension; Sgro received a six-month suspension).

Notwithstanding respondent's repetitive misconduct, we find that the compelling mitigating factors justify the imposition of a six-month suspension.

20

Members Doremus and Zmirich voted to impose a one-year suspension. Member Clark found that a three-month suspension was sufficient discipline. Member Gallipoli recused himself.

We further determine to require respondent to reimburse the Disciplinary Oversight Committee for administrative costs and actual expenses incurred in the prosecution of this matter, as provided in R. 1:20-17.

Disciplinary Review Board
Bonnie C. Frost, Chair

By: _____

Isabel Frank
Acting Chief Counsel

SUPREME COURT OF NEW JERSEY
DISCIPLINARY REVIEW BOARD
VOTING RECORD

In the Matter of Wanda Molina
Docket No.  DRB 13-097

Argued:   September 19, 2013

Decided:  November 7, 2013

Disposition: Six-month suspension

| *Members* | One-year Suspension | Six-month Suspension | Three-month suspension | Disqualified | Did not participate |
|-----------|---------------------|----------------------|------------------------|--------------|---------------------|
| Frost     | X |   |   |   |   |
| Baugh     |   | X |   |   |   |
| Clark     |   |   | X |   |   |
| Doremus   |   | X |   |   |   |
| Gallipoli |   |   |   | X |   |
| Yamner    |   | X |   |   |   |
| Zmirich   | X |   |   |   |   |
| Total:    | 2 | 3 | 1 | 1 |   |

Isabel Frank
Acting Chief Counsel